CENTRAL STOCK YARDS CO. v. LOUISVILLE & N. R. CO.

(Circuit Court of Appeals, Sixth Circuit. July 8, 1902.)

No. 1,070.

1. CARRIERS OF LIVE STOCK—DELIVERY—STOCK YARDS.

Where a railroad company has, by building stock yards, or by contract with a stock yards company, made adequate provision for the discharge of its duty as a common carrier with respect to live stock shipped over its line to a city, it is not required by the common law to make delivery of stock consigned to such city to connecting roads for delivery at other stock yards therein.

2. SAME—DISCRIMINATION—INTERSTATE COMMERCE ACT.

It is the duty of a carrier of live stock to provide reasonable facilities for the unloading and care of such stock; and where it has done so, either by building stock yards of its own or by contract with a stock yards company, its refusal to deliver stock to other stock yards in the same city is not an unlawful discrimination, in violation of section 3 of the interstate commerce act (24 Stat. 380).

3. SAME—CONNECTING RAILROADS—INTERCHANGE OF TRAFFIC.

In the absence of statutory provision, the interchange of traffic between two connecting railroads is a matter for contract between them, and the courts have no power to compel such interchange, or to fix the terms on which it shall be made. Nor is such power conferred upon the courts by the interstate commerce act.

4. SAME—INTERSTATE COMMERCE—STATE REGULATION.

A state is without power to compel a railroad company to transfer cars of live stock to a connecting road at a point of connection within the state, where the shipment was received in another state, and is, therefore, a subject of interstate commerce.

Appeal from the Circuit Court of the United States for the Western District of Kentucky.

This is a bill filed by the stock yards company against the railroad company seeking a mandatory injunction requiring the railroad company to receive, transfer, transport, and deliver shipments of live stock tendered to it outside the state of Kentucky, consigned or tendered to be consigned to any points of physical connection between its line and the line of the Southern Railway Company in Kentucky, and designated for the Central Stock Yards or its station in Kentucky; and in like manner to deliver, transport, and transfer such consignment to any person to whom it may be billed at said stock yards; and, further, to recognize the right of the consignor and the consignee to change at any of the stations of the said company the destination of said shipment, so as to make delivery in the manner agreed upon at a point of physical connection between the lines of the Southern Railway Company and the Louisville & Nashville Railroad Company for delivery to said Central Stock Yards; also seeking a temporary injunction and damages in the sum of $3,000. The Central Stock Yards Company is a duly organized corporation authorized to conduct a general business in the state of Kentucky. The Louisville & Nashville Railroad operates in the states of Kentucky, Tennessee, Alabama, Georgia, Mississippi, Louisiana, Florida, Indiana, and Illinois as a common carrier. The Central Stock Yards Company has located its plant just outside the city of Louisville, where it has facilities for receiving, unloading, feeding, and caring for live stock. This plant is about nine miles from the terminus of the Southern Railroad in the city of Louisville. It is further alleged that the Southern Railway Company has established a station, known as the "Central Stock Yards," at or near the location of the plant. The situation may be shown in a general way by the rough draft herewith shown.

¶ 4. State laws interfering with interstate or foreign commerce, see note to McCanna & Fraser Co. v. Citizens' Trust & Surety Co. of Philadelphia, 24 C. C. A. 21–37, pars. 18–58.

118 F.—8

A.—South Louisville.
B.—Fourth Street Crossing Southern Railway and Louisville & Nashville.
C.—Magnolia Avenue connection.
D.—Louisville & Nashville Kentucky Street Yards.
E.—Junction of two Southern Railway lines.
F.—Bergen & Meehan Switch.
G.—Central Stock Yards.
H.—Bourbon Stock Yards.
RED LINES — Louisville & Nashville Railroad. [The red lines are indicated by the dotted lines.]
BLACK LINES—Southern Railway.

The points of physical connection between the lines of the Southern Railway Company and the lines of the defendant are shown at F, B, and C of the diagram. The defendant company refused to receive stock from points outside the state of Kentucky billed to the Central Stock Yards Company, or to any person in its care, asserting the right to deliver all live stock designated for Louisville passing over its own lines at the Bourbon Stock Yards, shown on the map at H, with which company the defendant has a contract,—the Louisville & Nashville Railroad Company agreeing that it would not lease, rent, or sell within the city of Louisville for the establishment of any other stock yards, or establish any other stock yards within or adjacent to said city; that it will deliver, and cause to be delivered, so far as it legally may, all live stock shipped over the lines of the defendant company consigned to the city of Louisville, and will load all stock for other persons at said city at said yards; providing that, if the terms of such agreement should be invalidated by any judgment or order of the court, or by legislative requirement, then the stock yards company should have no claims for damages against the railroad company arising out of the terms of the contract. The Central Stock Yards Company is a corporation, and was established by an agreement with the Southern Railway Company, making it the stock yards of that company in Louisville and vicinity. It is claimed that the complainant has a right to compel the shipment of live stock and transfer of cars consigned to the Central Stock Yards Company at one of the points of physical connection with the Southern Railway upon three grounds: (1) That such is the legal duty of the defendant company as a common carrier.

(2) Because of the requirements of the act to regulate commerce, passed by the congress of the United States on February 4, 1887, known as the "Interstate Commerce Act." (3) By amended bill, that such is the duty of the corporation under the constitution and laws of the state of Kentucky. The circuit court dismissed the application for a temporary injunction, and afterwards dismissed the bill for want of jurisdiction in equity. Complainant appeals.

J. C. Dodd and W. M. Smith, for appellant.
Helm Bruce and Ed. Baxter, for appellee.

Before LURTON, DAY, and SEVERENS, Circuit Judges.

DAY, Circuit Judge (after stating the facts as above). The discussion in this case has taken a wide range. In our opinion, it may be disposed in the solution of a few leading propositions, the first being: Is there a right, independent of a statute, to require the railroad company to receive the live stock for shipment to the Central Stock Yards, and to deliver the cars at a point of connection with the Southern Railroad in Louisville for transportation thereof? It is apparent from a consideration of the testimony that the Central Stock Yards Company is primarily the stock yards of the Southern Railway Company. It is true the location is just beyond the city limits, but the business to be transacted is the Louisville business in the sale and forwarding of stock in these yards. The contract through which the Central Stock Yards originated is in the record, and there we find an agreement between the Southern Railway Company and the Central Stock Yards Company in which is recited the desire of the railroad company to establish a general stock depot "for the receiving and delivery of stock at Louisville, Kentucky." After stipulations as to the reception and care of the stock, it is further provided that the railroad company will establish the premises of the stock yards company as its stock depot for the purpose of handling live stock to and from Louisville, and agrees not to sell, lease, or use, or license to be used, any part of its ground in or adjacent to Louisville for the establishment of any other stock yards, or otherwise facilitate the establishment of any other stock yards in the city, and will establish no other stock yards depot at or near said city. The railroad company further agrees to establish Louisville rates to and from the premises of the said company on certain lines. It is apparent from these stipulations of the contract that the parties understood that the Central Stock Yards was intended to be, as in fact it is, a Louisville stock yards, to be used, as is recited in the contract, in building up the live-stock business to and from Louisville. We have no question that the Central Stock Yard is as distinctly a yard for the transaction of the business of receiving, keeping, and selling of stock at Louisville as is the Bourbon Stock Yards, established for the same purpose by contract with the defendant company. The question on this branch of the case is thus narrowed to the consideration of the rights of the complainant to require of the Louisville & Nashville Railroad Company shipments and transfers to the Central Stock Yards Company, over the connection with the Southern Railroad, of live stock whose destination is Louisville. The peculiar duties of a common carrier of live stock are pointed out by Mr. Justice Field in North Pennsylvania

R. Co. v. Commercial Nat. Bank, 123 U. S. 727, 8 Sup. Ct. 266, 31 L. Ed. 287. The animals cannot be turned loose, or left without food or shelter in cars standing on the railroad tracks or sidings. They must be placed in suitable quarters, where they can be fed and cared for under the charge of competent agents. The nature of the property requires these services, essential to the discharge of the duty of the carrier in the safe transportation and delivery of live stock. For this purpose it is the duty of the carrier to make provision by suitable yards and proper equipment and competent persons to manage and control the care and delivery of the live stock. We perceive no reason why this duty cannot be discharged by contract with proper persons or companies who shall undertake the same under the responsibility of the carrier. Such a contract was enforced in Railroad Co. v. Struble, 109 U. S. 381, 3 Sup. Ct. 270, 27 L. Ed. 970. Justice Harlan observed in Stock Yards Co. v. Keith, 139 U. S. 128–136, 11 Sup. Ct. 461, 464, 35 L. Ed. 73:

"It did not concern them [the complainants] whether the railroad company duly maintain stock yards or employed another company or corporation to supply the facilities for receiving and delivering live stock it was under the obligation to the public to provide."

There is no showing of the inadequacy of the Bourbon Stock Yards Company in the matter of accommodations for receiving and caring for cattle. The defendant has there made provisions ample for the care of such stock with a company obligated to discharge the duties in this behalf required by the law of common carriers. Is the defendant obliged by law to make Louisville delivery at other points by making connections for other Louisville stock yards? We think this question must be answered in the negative. To all intents it was so answered by this court in Butchers' & Drovers' Stock Yards Co. v. Louisville & N. R. Co., 14 C. C. A. 290, 67 Fed. 35. In that case the railroad company had entered into a contract with the Union Stock Yards Company, which made it the stock yards depot of the Louisville & Nashville Railroad Company at Nashville. A spur track had been run down Front street, in Nashville, for the accommodation of freight shippers not handling live stock. About 40 feet from this track the Butchers' & Drovers' Company established an independent stock yards. The Butchers' & Drovers' Company sought a mandatory injunction to compel the railroad company to build or allow to be built a side track connecting the spur track with the complainant's stock yards, there to deliver and receive cattle consigned or shipped by the complainant. The obtaining of the right of way and the expense of building the side track were not required of the defendant company, and are not elements essential to the disposition of the case in the opinion rendered by Judge Taft. The contention of the railroad company that, having established a live-stock depot in Nashville, for the reception and delivery of stock in that city, it could not be compelled to receive and deliver from another depot in the city, was sustained. Judge Taft quotes from the opinion of Judge Harlan in Stock Yards Co. v. Keith, 139 U. S. 128, 11 Sup. Ct. 461, 35 L. Ed. 73, as follows:

"We must not be understood as holding that the railroad company in this case was under any legal obligation to furnish, or cause to be furnished,

suitable and convenient appliances for receiving and delivering live stock at every point on its line in the city of Covington where persons engaged in buying, selling, or shipping live stock choose to establish yards. In respect to the mere loading and unloading of live stock, it is only required, by the nature of its employment, to furnish such facilities as are reasonably sufficient for the business at that city. So far as the record discloses, the yards maintained by the appellant are, for the purposes just stated, equal to all the needs, at that city, of shippers and consignors of live stock; and, if the appellee had been permitted to use them without extra charge for mere 'yardage,' they would have been without just grounds of complaint in that regard, for it did not concern them whether the railroad company itself maintained stock yards, or employed another company or corporation to supply the facilities for receiving and delivering live stock it was under obligation to the public to furnish. But, as the appellant did not accord to appellees the privileges they were entitled to from its principal, the carrier, and as the carrier did not offer to establish a stock yard of its own for shippers and consignees, the court below did not err in requiring the railroad company and the receivers to receive and to deliver live stock from and to the appellees at their stock yards in the immediate vicinity of the appellant's yards, when the former were put in proper condition to be used for that purpose, under such reasonable regulations as the railroad company might establish. It was not within the power of the railroad company, by such agreement as that of November 19, 1881, or by agreement in any form, to burden the appellees with charges for services it was bound to render without any other compensation than the customary charges for transportation."

We think this language is no less applicable to the case under consideration. The Louisville & Nashville Railroad Company has by contract arranged for the discharge of its duties to shippers of live stock at the Bourbon Stock Yards. The proof does not show that these accommodations are inadequate, or the charges illegal. It would doubtless be convenient, and promote the business of dealers and shippers, if other facilities were afforded; but we find in the law nothing aside from a positive statute that requires more ample provision at the hands of the respondent.

It is further alleged in the bill that the refusal to make the desired shipping and transfer of stock to the yards of the complainant is a violation of section 3 of the interstate commerce act, which provides:

"That it shall be unlawful for any common carrier subject to the provisions of this act to make or give undue or unreasonable preference or advantage to any particular person, firm, corporation, or locality, or any particular description of traffic, in any respect whatsoever, or to subject any particular person, company, firm, corporation or locality, or any particular description of traffic, to any undue or unreasonable prejudice or disadvantage in any respect whatsoever. Every common carrier subject to the provisions of this act shall, according to their respective powers, afford all reasonable, proper and equal facilities for the interchange of traffic between their respective lines, and for the receiving, forwarding and delivering of passengers and property to and from their respective lines, and those connecting therewith, and shall not discriminate in their rates and charges between such connecting lines; but this shall not be construed as requiring any such common carrier to give the use of its tracks or terminal facilities to another carrier engaged in like business."

The claim is that, having granted certain rights and privileges to the Bourbon Stock Yards Company, this section guaranties equal privileges to the Central Stock Yards Company. This construction of the act is not sustainable. It is the duty of the railroad company to provide reasonable facilities for the unloading and care of live stock. This duty it might discharge by itself furnishing sufficient facilities,

or it might contract with others to make such provision. The respondent has chosen the latter course. By contract with the Bourbon Stock Yards Company it has provided facilities for the care of stock received at Louisville. These facilities cannot be denied to some and afforded to others. But this is far from saying that it was the purpose of the law to dictate to common carriers the means by which it shall discharge its obligations to shippers. To hold otherwise would be, having regard to the present case, to require the railroad company to make connections with as many stock yards companies as may see fit to provide facilities equal to those furnished by the company or its agents. This would be carrying the act far beyond its terms and purposes. Kentucky & I. Bridge Co. v. Louisville & N. R. Co. (C. C.) 37 Fed. 621, 2 L. R. A. 289.

These considerations dispose of this branch of the case. If it could be regarded as one involving the right to require one railroad to interchange traffic with another, the position of the complainant would be equally untenable. At common law a railroad company is only bound to transport freight to its own terminus. The rule is thus stated in Atchison, T. & S. F. R. Co. v. Denver & N. O. R. Co., 110 U. S. 667, 4 Sup. Ct. 185, 28 L. Ed. 291:

"At common law a carrier is not bound to carry except on his own line, and we think it quite clear that, if he contracts to go beyond, he may, in the absence of statutory regulations to the contrary, determine for himself what agencies he will employ. His contract is equivalent to an extension of his line for the purposes of his contract; and if he holds himself out as a carrier beyond his line, so that he may be required to carry for all alike, he may nevertheless confine himself in carrying to the particular route he chooses to use. He puts himself in no worse position, by extending his route with the half of others, than he would occupy if the means of transportation employed were all his own. He certainly may select his own agencies and his own associate for doing his own work."

It is averred in the bill that the Southern Railway Company has notified the respondent that it would be, and now is, willing to be responsible from points of physical connection with the Louisville & Nashville Railroad for the delivery of such live stock and the collection of all charges on the same, and would promptly return to such points of connection all empty cars, and would account for all freight charges collected in the usual way. This may be true, and would possibly be a reasonable arrangement. But have the courts the right, in the absence of statute, to dictate, to carriers the contracts they shall make in the interchange of traffic, and to require such to be carried out as the courts deem reasonable? The billing and transfer of freight from outside points over the two railroads is a matter of arrangement between them. The proportion of the joint tariff each shall receive, the handling of cars, the liability of one to the other, and other matters, are to be determined by the contract between the parties. Each controls its own railroad, and may determine for itself upon what terms it will unite in a joint tariff. No arrangement exists with the Southern Railroad for the transportation and delivery of cars of live stock to the Central Stock Yards, if that can be assumed to be a station on the line of the Southern Railroad; nor do we think a court of equity has the power to make one, and

supervise its execution; nor has this right been conferred upon the courts by the interstate commerce act. This doctrine is so thoroughly established as to require no more than the citation of the authorities in support of it. Atchison, T. & S. F. R. Co. v. Denver & N. O. R. Co., 110 U. S. 667, 4 Sup. Ct. 185, 28 L. Ed. 291; Express Cases, 117 U. S. 1, 6 Sup. Ct. 542, 628, 29 L. Ed. 791; Pullman's Palace Car Co. v. Missouri Pac. R. Co., 115 U. S. 587, 6 Sup. Ct. 194, 29 L. Ed. 499; Northern Pac. R. Co. v. Dustin, 142 U. S. 492, 12 Sup. Ct. 283, 35 L. Ed. 1092; Kentucky & I. Bridge Co. v. Louisville & N. R. Co. (C. C.) 37 Fed. 567, 2 L. R. A. 289; Little Rock & M. R. Co. v. St. Louis, I. & M. Ry. Co. (C. C.) 41 Fed. 559; Oregon Short Line & U. N. R. Co. v. Northern Pac. R. Co. (C. C.) 51 Fed. 475; St. Louis Drayage Co. v. Louisville & N. R. Co. (C. C.) 65 Fed. 39; Allen & Lewis v. Oregon R. & Nav. Co. (C. C.) 98 Fed. 16.

It is further alleged that the duty of complying with the complainant's demand rests upon the defendant company because of the requirements of the constitution of the state of Kentucky and the laws passed in pursuance thereof. Assuming, without deciding, that the Kentucky constitution and legislation require the defendant company to receive, deliver, transport, and transfer freight to any point that is in physical connection with the tracks of another company, so that the complainant has, as to traffic originating in Kentucky, the right to require that the shipment be received and transported in accordance with the prayer of the bill, the question remains, have the Kentucky constitution and statutes any operations beyond the limits of that state? The interstate commerce clause of the federal constitution has given rise to much litigation and frequent construction by the supreme court. It is thoroughly settled that the power of congress to regulate commerce is plenary, and no state has the right to regulate purely interstate commerce. On the other hand, the state has the right to make provisions as to matters within its own boundaries intended as aids to commerce, not thereby regulating interstate traffic. Without undertaking to reconcile or consider the numerous decisions, we may refer to Mobile Co. v. Kimball, 102 U. S. 691, 26 L. Ed. 238. Mr. Justice Field, with his usual clearness, has called attention to the sound rules of construction to determine what is and what is not within the power of a state:

"Perhaps some of the divergence of views upon this question among former judges may have arisen from not always bearing in mind the distinction between commerce, as strictly defined, and its local aids or instruments or measures taken for its improvement. Commerce with foreign countries and among the states, strictly considered, consists in intercourse and traffic, including in these terms navigation and the transportation and transit of persons and property, as well as the purchase, sale, and exchange of commodities. For the regulation of commerce, as thus defined, there can be only one system of rules, applicable alike to the whole country; and the authority which can act for the whole country can alone adapt such a system. Action upon it by separate states is not, therefore, permissible." Page 702, 102 U. S., 26 L. Ed. 238.

It is within the power of a state to require connecting tracks between two railroad companies at an intersection for the transfer of cars used in the local business of such lines of railroad. This may

have been necessary for the accommodation of state commerce. Railroad Co. v. Jacobson, 179 U. S. 287, 21 Sup. Ct. 115, 45 L. Ed. 194. So it is competent for a state to require a railroad company to stop a certain number of trains each day at stations having a certain number of inhabitants, within the state. Such regulations do not interfere with the delivery or transportation of passengers traveling between states in such wise as to be regulations affecting interstate traffic. The statute simply amounted to requiring three trains of the company to stop at the station named each day. Lake Shore & M. S. R. Co. v. Ohio, 173 U. S. 285, 19 Sup. Ct. 465, 43 L. Ed. 702. Likewise a state may require a telegraph company to deliver a message. Telegraph Co. v. James, 162 U. S. 650, 16 Sup. Ct. 934, 40 L. Ed. 1105. But it is thoroughly well settled that a state may not regulate interstate commerce, using the terms in the sense of intercourse and the interchange of traffic between the states. In the case at bar we think the relief sought pertains to the transportation and delivery of interstate freight. It is not the means of making a physical connection with other railroads that is aimed at, but it is sought to compel the cars and freight received from one state to be delivered to another at a particular place and in a particular way. If the Kentucky constitution could be given any such construction, it would follow it could regulate interstate commerce. This it cannot do.

We reach the conclusion that no case was made justifying the relief prayed for, and that there was no error committed in dismissing the bill. Judgment affirmed.