## Richmond

APPALACHIAN POWER COMPANY v. JOHN STEWART WALKER, INC.

January 14, 1974.

Record No. 8243.

Present, All the Justices.

*Wm. Rosenberger, Jr.,* for appellant.

*S. J. Thompson, Jr., (Caskie, Frost, Davidson, Hobbs & Hamblen,* on brief), for appellee.

*Richard D. Rogers, Jr.; Joel H. Peck,* on brief, for the State Corporation Commission, *amicus curiae.*

POFF, J., delivered the opinion of the court.

On a bill of complaint filed by John Stewart Walker, Inc., (Walker) against Appalachian Power Company (Appalachian) seeking *inter alia* damages of $10,000.00 for breach of an alleged contract to install, free of charge, underground electrical service, the trial court by order dated October 13, 1972 entered final judgment on the jury's verdict awarding Walker damages in the sum of $6,000.00. Upon Appalachian's appeal, we granted the petition of the State Corporation Commission (Commission) to appear *amicus curiae.*

For a number of years prior to 1970, Appalachian conducted a sales promotion program designed to encourage real estate developers to build "all electric" residences. Under that program, Appalachian agreed to install underground rather than overhead electrical service. Against the cost of installation, the developer was allowed a credit based upon anticipated revenues. If the credit exceeded the cost, installation was provided free of charge to the developer. In order to calculate the credit, Appalachian needed a plat of the subdivision.

In 1968, Appalachian acquired the plats of three subdivisions developed by Walker, prepared written contracts on standard printed forms and installed underground facilities free of charge. In the summer of 1969, Walker contracted to buy property in Lynchburg which he later developed as Sections I and II, Locksview Subdivision. Section I containing 20 lots was platted October 28, 1969, and the plat was approved by the city planning commission on November 19, 1969. Section II containing 6 lots across the street from Section I was platted May 12, 1970, and the plat was approved on June 23, 1970. A composite plat showing both sections was dated June 24, 1970.

In the fall of 1969, Walker asked Earl Driskill and Lloyd Miller, Appalachian's representatives, to install underground electrical service on the same terms used in the earlier Walker subdivisions, and they agreed. Miller testified that the customary understanding between

Appalachian and the developer was that Appalachian would reduce the contract to writing "in a reasonable time" and submit it for signature to the developer. Driskill and Miller told Walker, "Fine, we will work it up for you."

The contract was never reduced to writing. Walker testified that in his previous dealings with Appalachian, Appalachian had taken the initiative to acquire plats from the surveyor, a custom confirmed by the surveyor and by Driskill; that the surveyor had told him that he mailed the Locksview plat to Appalachian in February or March, 1970; and that sometime prior to the first week in May, 1970 when Walker moved to a new business office Driskill picked up a second set of Locksview plats from Walker's old office. Miller testified that Appalachian did not receive the plat for Section I until a "couple of days after May 22, 1970." Driskill testified that he could not remember the date he picked up that plat but that when he did so he was told "to hold up and they would have it [the plat for Section II] ready so we could do the whole job at one time." Walker testified that Driskill was not told that.

On April 15, 1970, following a hearing held pursuant to a show cause order entered on February 17, 1970, the State Corporation Commission entered an order prohibiting public utilities from conducting sales promotion programs such as that Appalachian conducted, provided that "(B) Written contracts heretofore entered into may be carried out in accordance with their terms . . ." These proceedings were unknown to Walker until sometime after May 15, 1970 when Miller advised Walker a new rule was going into effect but that "we are going to get you under the wire on the old rule." On August 17, 1970, learning that the street adjacent to Section I was about to be paved, Walker called Miller asking that the underground facilities be installed before paving was commenced. Miller advised Walker that under the mandate of the April 15, 1970 Commission order, the program was no longer lawful and Walker would have to pay the full cost of installation.

On August 21, 1970 Walker filed a petition under Code § 56-6 (Repl. Vol. 1969) in the State Corporation Commission praying "that the State Corporation Commission permit and require Appalachian Power Company to honor its oral contract with complainant to install underground electrical service in its subdivision free of charge, and, to the extent necessary, relax the requirements of the order entered

on April 15, 1970". On September 16, 1970, the Commission entered an order denying Walker's prayer.

On September 30, 1970, to Walker's bill of complaint filed in the trial court on August 25, 1970, Appalachian filed a plea challenging the jurisdiction of the trial court on the ground that the State Corporation Commission had exclusive jurisdiction; a plea of res judicata based on the ground that the subject matter of the bill of complaint was the same as that already finally adjudicated as to the same parties by the Commission; a plea of illegality based on the ground that the contract alleged in the bill of complaint was unlawful and unenforceable under the rates, rules and regulations adopted by the Commission; and an answer.

In an opinion dated April 19, 1971, the trial court held that Appalachian's plea of illegality raised two issues of fact. A jury was empaneled, and on September 17, 1971 at the conclusion of the evidence, the trial court submitted the following inquiries to the jury:

"(1)  Has the Complainant, John Stewart Walker, Inc., proven by a preponderance, or greater weight, of the evidence, that Appalachian Power Company had a duty or obligation to prepare and have signed a written contract for installation of underground electric service for Walker prior to April 15, 1970?

"(2)  If the answer to the above question is 'yes', did Appalachian unreasonably fail to perform such duty?"

The jury answered both questions in the affirmative.

On June 2, 1972 the trial court overruled Appalachian's several pleas. The parties agreed to submit to the trial court upon the evidence previously taken and the transcript of the hearing before the Commission the question whether there was a contract between the parties and to submit to a jury the question of damages. The trial court instructed the jury to determine "[t]he difference, if any, in the fair market value of the 20 lots in Section I of Locksview Subdivision with overhead electrical service on August 17, 1970." Appalachian offered and the trial court refused an instruction which told the jury that "the difference, if any, cannot exceed $3,546.00", the cost of installation. The jury returned a verdict for Walker in the sum of $6,000.00.

In an opinion dated July 11, 1972 the trial court said that "I feel that all issues should be resolved in favor of the complainant" and

asked for briefs limited to the question whether damages should be measured by the "cost rule" or the "value rule". By letter opinion dated September 15, 1972 and final order dated October 13, 1972 the trial court entered judgment for Walker on the jury verdict.

Upon two of its nine assignments of error Appalachian poses for our determination four issues, viz.,

"A. Whether the State Corporation Commission has exclusive jurisdiction (Assignment E);

"B. Whether the Order of the Commission was res judicata (Assignment E);

"C. Whether the performance of the alleged contract was illegal (Assignment E);

"D. Whether damages are limited to cost of installation (Assignment H)."

We approach consideration of these issues seriatim, ever conscious of a fact central to each issue, viz., that Walker's cause of action is based upon an alleged breach of a common law contract right to have an oral agreement reduced to writing within a reasonable time and prior to April 15, 1970.

## I. *EXCLUSIVE JURISDICTION*

■ We have said repeatedly that "[t]he Commission has no inherent power simply because it was created by the Virginia Constitution; and therefore its jurisdiction must be found either in constitutional grants or in statutes which do not contravene that document." *City of Norfolk* v. *Virginia Electric & Power Co.*, 197 Va. 505, 514, 90 S.E.2d 140, 146 (1955); *Commonwealth* v. *Old Dominion Power Co.*, 184 Va. 6, 34 S.E.2d 364, *cert. denied*, 326 U.S. 760 (1945); *City of Richmond* v. *Chesapeake & Potomac Telephone Co.*, 127 Va. 612, 105 S.E. 127 (1920).

In looking to the Constitution and statutes for an explication of the Commission's power, we must first ascertain the nature of the proceedings involved, for the Commission " 'has been clothed with legislative, judicial and executive powers.' " *Clifton Forge-Waynesboro Telephone Co.* v. *Commonwealth*, 165 Va. 38, 47, 181 S.E. 439, 443 (1935); *Winchester & Strasburg R.R.* v. *Commonwealth*, 106 Va. 264, 267, 55 S.E. 692, 693 (1906). Which of the Commission's several powers is exercised in a particular proceeding "depends not

upon the character of the [Commission] but upon the character of the proceedings." *Prentis* v. *Atlantic Coast Line Co.*, 211 U.S. 210, 226 (1908). Addressing the definition of powers delegated to the Vermont Public Service Commission, the Supreme Court of Vermont said:

> "It is often difficult to distinguish between functions that are judicial and those that are not. Executive or administrative acts frequently involve the exercise of judgment and discretion, qualities which are deemed to characterize a judicial act. But it is the quality of the act and not the official classification of the actor that determines this question, and an official act requiring the exercise of discretion and judgment may be administrative or judicial according to the nature of the subject matter." *Trybulski* v. *Bellows Falls Hydro-Electric Corp.*, 112 Vt. 1, 8, 20 A.2d 117, 120 (1941).

As we have said, the nature of Walker's bill of complaint was the alleged breach of a common law right under an alleged contract.[1] The issue Appalachian raises is whether the Commission had exclusive jurisdiction to adjudicate, i.e., exercise judicial power with respect to, the contract claim asserted by Walker, a private corporation, against Appalachian, a public service corporation.

Collectively, the arguments advanced by Appalachian and the Commission in support of the plea of exclusive jurisdiction are that Virginia Constitution § 156 (1902)[2] and Code §§ 56-6, -232 to -247 (Repl. Vol. 1969), *as amended*, (Cum. Supp. 1970), gave the Commission broad *legislative* power, encompassing the state's police power, to regulate public service corporations in the performance of the public duties imposed upon them by law; that in the regulation of rates charged and services provided, this power is plenary and paramount; that under Code § 56-236 (Repl. Vol. 1969) this power extends to all rules and regulations that in any manner affect the rates charged by a public service corporation; and that this legislative power transcends private contract rights in contracts affecting rates.

---

[1] Walker's bill also alleged that Appalachian acted "in an unfair and discriminatory manner . . . in violation of Title 56 of the Code of Virginia of 1950", but this claim was not pursued, decided by the trial court, or raised on this appeal.

[2] Virginia Constitution (1902), effective when Walker filed his bill in the trial court and his petition with the Commission, has been replaced by Virginia Constitution (1971) in which the language of the provisions relating to the Commission have been substantially changed.

Appalachian and the Commission argue further that Code § 56-247 (Repl. Vol. 1969) required the Commission to investigate promotional practices and to take action found to be in the public interest; that upon such investigation, the Commission promulgated its April 15, 1970 order proscribing such practices except when pre-existing contracts had been reduced to writing; that under Code § 56-6 (Repl. Vol. 1969) the Commission is the proper forum to determine whether the public service corporation had a public duty to perform a contract such as Walker alleged; and that by its order entered September 16, 1970 the Commission ruled in effect that Appalachian had no public duty to perform such a contract.

These arguments do not persuade us that the Commission had exclusive jurisdiction to adjudicate the cause of action stated in Walker's bill of complaint. That cause of action was not based on Appalachian's failure to perform any public duty imposed upon it by law. It was based solely on the alleged breach of a common law right under an alleged contract. Unless ousted of jurisdiction by law, circuit courts have jurisdiction over common law contract claims.[3] Appalachian and the Commission cite no constitutional provision or statute which ousts circuit courts of such jurisdiction over Walker's claim. This is because there is none. Rather, the Constitution and every Code title which conferred powers upon the Commission affirmatively preserved such jurisdiction in the circuit courts.[4] It follows that the Commission's jurisdiction, if any, was not exclusive jurisdiction.

We now consider whether the Commission had any jurisdiction to adjudicate Walker's common law contract claim. For jurisdiction, the Commission and Appalachian rely upon § 156 (b) of the Virginia

---

[3] We note from the transcript of Walker's hearing before the Commission that Walker's bill of complaint, then pending in the Circuit Court, was openly disclosed and fully discussed and that neither counsel for Appalachian, counsel for the Commission, nor the Commissioners themselves questioned the Circuit Court's jurisdiction.

[4] "(h) The right of any person to institute and prosecute in the ordinary courts of justice any action, suit or motion against any transportation or transmission company, for any claim or cause of action against such company, shall not be extinguished or impaired by reason of any fine or other penalty which the Commission may impose, or be authorized to impose, upon such company, because of its breach of any public duty, or because of its failure to comply with any order or requirement of the Commission . . ." Virginia Constitution § 156 (h) (1902).

§ 12-2. Concurrent jurisdiction of Commission and courts. Code § 12-2 (Repl. Vol. 1964) (Repealed by Acts 1971, Ex. Sess., c. 157).

§ 56-7. Common law, etc., remedies not altered or abridged. Code § 56-7 (Repl. Vol. 1969).

§ 56-253. Existing remedies retained. Code § 56-253 (Repl. Vol. 1969).

Constitution (1902) as implemented by Code § 56-6 (Repl. Vol. 1969) which empowers the Commission "sitting as a court of record" to hear certain defined claims of those aggrieved by the conduct of a public service corporation and "to compel any public service corporation to observe and perform any public duty imposed upon public service corporations by the laws of this Commonwealth". For two reasons, that reliance is misplaced.

First, the language of Virginia Constitution § 156 (b) (1902) and Code § 56-6 "shows conclusively that the powers of the Commission relate only and always to the performance of the public duties of such public service corporations. . . . The jurisdiction is not conferred by the mere fact that the subject may be of interest to the public. Only the obligations and duties imposed by law upon these public utility corporations are subjected to the supervision and control of the Commission." *City of Portsmouth* v. *Virginia Ry. & Power Co.*, 141 Va. 54, 60-61, 126 S.E. 362, 363-64 (1925) (discussing § 156 (b) as implemented by prior statutes); *See* Code § 12-14 (Repl. Vol. 1964) (Repealed by Acts 1971, Ex. Sess., c. 157). Similarly, we have said that the constitutional provisions and implementing statutes "were not intended to confer upon the commission jurisdiction to hear and determine cases against such corporations, in which the matters in controversy relate primarily to injuries to private property rights and only affect the public incidentally." *Newport News Light & Water Co.* v. *Peninsular Pure Water Co.*, 107 Va. 695, 698, 59 S.E. 1099, 1100 (1908) (Discussing § 156 as implemented by prior statutes).

As these opinions illustrate, Commission jurisdiction turns upon the existence of a *public duty imposed by law* upon public service corporations. Where such existed, we have held that the Commission had jurisdiction. *Southern Ry.* v. *Commonwealth*, 128 Va. 176, 105 S.E. 65 (1920); *Southern Ry.* v. *Commonwealth*, 124 Va. 36, 97 S.E. 343 (1918). Where none existed, we have held that the Commission had no jurisdiction. Thus, the Commission had no jurisdiction over a street railway's purely contractual obligation to pave the streets along its tracks. *City of Portsmouth* v. *Virginia Ry. & Power Co.*, *supra*. Nor did the Commission have jurisdiction over a claim that the public would be benefitted if the Commission would require all railroads serving a town to use a common terminal. *Commonwealth* v. *Norfolk & Western Ry.*, 111 Va. 59, 68 S.E. 351 (1910).

Here, there was no public duty imposed by law upon Appalachian to install electrical service underground, the basic subject matter of Walker's alleged contract. Appalachian voluntarily engaged in a program designed to generate more business. As we said in *Commonwealth* v. *Norfolk & Western Ry.*, *supra*, 111 Va. at 64, 68 S.E. at 353, under § 156 (b) " '[i]f there [was] no duty imposed as to the particular act, the [public service corporation was] free to make such contracts as its interests may require.' "

Second, reliance is misplaced because it is clear from the face of the statute relied upon that it is inapplicable to Walker's common law contract claim. Code § 56-6 applies to the claim of "[a]ny person or corporation aggrieved by anything done or omitted *in violation of any of the provisions of this or any other chapter under this title*, by any public service corporation" (emphasis supplied). Walker's claim was not based on the violation of any provision of Title 56.

But, argue Appalachian and the Commission, under Code § 56-236 the Commission's broad *legislative* power over rates extends to all rules and regulations that in any manner *affect* the rates charged; that promotional practices such as that involved in Walker's claim were proscribed because they affect rates; and that the Commission therefore had jurisdiction to adjudicate Walker's claim. We reject this argument on alternative grounds.

First, Code § 56-236 (Repl. Vol. 1969) confers no power on the Commission to adjudicate a common law claim arising from a contract that affects rates. The statute is addressed to "[e]very public utility". It prescribes rules of conduct. It requires every public utility to file and "keep open to public inspection" rate schedules and "all rules and regulations that in any manner affect the rates charged or to be charged." It does no more than that.

Second, Walker's contract theory at trial was that Appalachian breached its contract by failing to reduce the oral agreement to writing within a reasonable time prior to the Commission's April 15, 1970 order. As framed by the litigants and as submitted to the jury, the factual issue was whether Appalachian breached a contractual duty prior to the Commission's order. While, as all concede, the Commission had the power to promulgate its April 15, 1970 order proscribing Appalachian's obligations under pre-existing oral contracts to install underground electrical service free of charge, the Commission by this valid exercise of its legislative power cannot confer

upon itself power to adjudicate common law contract claims which arose prior to the entry of that order.

Appalachian's basic premise is that because the Commission is empowered to exercise broad *legislative* powers in regulating rates it necessarily has an attendant power to *adjudicate* a common law contract claim which "affects" rates. That premise is false. Under Virginia Constitution (1902), the whole of the legislative, executive, and judicial powers was vested separately in distinct departments of governments.[5] We have construed § 156 to "clothe" the Commission with legislative, judicial, and executive powers but not with the full cloak of any of these. *See Winchester & Strasburg R.R.* v. *Commonwealth, supra,* 106 Va. at 268, 55 S.E. at 693. That the Commission has been granted explicit jurisdiction to exercise one of its limited powers over a particular subject matter does not mean that it has been granted implicit jurisdiction to exercise the same power over another subject matter or to exercise another of its limited powers over the same subject matter.

In *City of Richmond* v. *Southern Ry.,* 203 Va. 220, 123 S.E.2d 641 (1962) we held that the Commission's jurisdiction to adjudicate the claim of the railroad that a city zoning ordinance prevented the railroad from discharging a public duty imposed by law does not carry with it jurisdiction to adjudicate the validity of the zoning ordinance.

Nor does the Commission's legislative power over rates carry with it jurisdiction to adjudicate a common law contract claim which arguably "affects" rates. Power to legislate is not jurisdiction to adjudicate.

> "While it is true that the Commission has been clothed with legislative, judicial and executive powers, yet nowhere in the organic law is the Corporation Commission empowered to pass upon the validity of a private contract or to enforce the provisions of such a contract. This is a power intrusted exclusively to the courts." *Norfolk & Western Ry.* v. *Commonwealth,* 143 Va. 106, 113-14, 129 S.E. 324, 326 (1925).

In *City of Lynchburg* v. *Commonwealth,* 164 Va. 57, 63-64, 178 S.E. 769, 771 (1935), we adopted the Commission's conclusion that:

> " 'Nothing is better settled than that this Commission does not have jurisdiction to adjudicate and determine private rights or private

---

[5] Virginia Constitution (1902) §§ 39, 40, 69, 87.

contracts between public service corporations and individuals. Authorities are abundant, but a few will suffice. See *Newport News Light & Water Co.* v. *Peninsular Pure Water Co.* (1908), 107 Va. 695, 59 S.E. 1099; *N. & W. Ry. Co.* v. *Commonwealth* (1925), 143 Va. 106, 129 S.E. 324. Also, see *Portsmouth* v. *Va. Ry. & Power Co.* (1925), 141 Va. 54, 126 S.E. 362, 39 A.L.R. 1510; *Hampton* v. *Newport News & Hampton Ry., etc., Co.* (1926), 144 Va. 24, 131 S.E. 330. * * *' "

More recently, in *Sydnor Pump & Well Co.* v. *Taylor*, 201 Va. 311, 317, 110 S.E.2d 525, 530 (1959), we cited this unbroken chain of precedent,[6] denied the Commission's jurisdiction, and said that "[t]he question whether a contract has been breached is for the courts to determine." We will not break the chain now. We hold that the Commission had no constitutional or statutory jurisdiction to adjudicate Walker's common law claim against Appalachian.

## II. *RES JUDICATA*

Assuming that Walker's proceeding before the Commission was a valid exercise of one of its non-adjudicatory powers, it is clear that the Commission's order of September 16, 1970 was not res judicata. "Only what is adjudicated can be res judicata. Administrative action other than adjudication cannot be res judicata." 2 K. Davis, *Administrative Law Treatise*, § 18.08 at 597 (1958).

Even if we could assume that the Commission had jurisdiction to adjudicate Walker's common law contract claim, that claim was not alleged in Walker's petition to the Commission nor decided by the Commission's order.

Since the Commission had no power to adjudicate and did not adjudicate Walker's claim, the Commission's September 16, 1970 order cannot be res judicata in respect to Walker's circuit court action and whether Walker appealed the Commission's order is therefore irrelevant.

## III. *PLEA OF IMPOSSIBILITY OF PERFORMANCE*

The defense of impossibility of performance on account of illegality is not available to a promisor when "the impossibility was

---

[6] Significantly, neither Appalachian nor the Commission cite any decision upholding the Commission's jurisdiction to adjudicate a common law contract claim.

due to his fault." *Housing Authority of the City of Bristol* v. *East Tennessee Light & Power Co.*, 183 Va. 64, 72, 31 S.E.2d 273, 276 (1944). Whether Appalachian's failure to reduce the oral agreement to writing within a reasonable time prior to the date of the Commission's order was a breach of a contractual duty which contributed to impossibility of performance on account of illegality was a factual question which the jury resolved against Appalachian.

Appalachian's argument that there was no evidence of what constituted a "reasonable time" is without merit. When a contract does not specify a time for performance, the law implies a reasonable time. *Merriman* v. *Cover, Drayton & Leonard*, 104 Va. 428, 51 S.E. 817 (1905).

> "[I]t is well settled that it is for the jury to say what is a reasonable time, under all the circumstances of the case, under proper instructions from the court." *Duke* v. *Norfolk & Western Ry.*, 106 Va. 152, 155, 55 S.E. 548, 549 (1906).

## IV. *DAMAGES*

Walker's evidence tended to show that the lack of underground electrical facilities reduced the sale value of the 20 lots by $8,000.00. Appalachian's evidence tended to show that the cost of installation was $3,546.00. The trial court granted Walker's instruction based on the "value" formula, refused Appalachian's instruction based on the "cost" formula, and overruled Appalachian's motion to set aside the jury verdict based on the "value" formula.

A successful plaintiff is entitled to recover those damages which are "the natural and direct result of the breach of the contract". *Manss-Owens Co.* v. *H. S. Owens & Son*, 129 Va. 183, 201, 105 S.E. 543, 549 (1921). And "[t]he object of the law in awarding damages is to make amends, or reparations, by putting the party injured in the same position, as far as money can do it, as he would have been if the contract had been performed." *Lehigh Portland Cement Co.* v. *Virginia Steamship Co.*, 132 Va. 257, 270, 111 S.E. 104, 109 (1922).

Whether the "value" formula or the "cost" formula is applicable "will depend on the facts and the circumstances of the particular case." *Mann* v. *Clowser*, 190 Va. 887, 905, 59 S.E.2d 78, 86 (1950). We have recognized application of the "value" formula in an appropriate case. *Barcroft Woods, Inc.* v. *Francis*, 201 Va. 405, 111 S.E.2d 512 (1959). The test is the nature of the motivation which

induced the promisee to make the contract. If his primary interest was the value of the result performance would have produced, then the "value" formula is applicable; if performance itself, then the "cost" formula. G. Grismore, *Grismore on Contracts*, § 195 at 299 (rev. ed. J. Murray 1965).

The uncontradicted evidence was that Walker was developing Locksview Subdivision to sell lots; that his reason for wanting underground electrical service was to enhance the marketability and market price of the lots; and that the lack of such service impaired both by a measurable degree. The first jury found that such impairment was the natural and direct result of Appalachian's breach of a contractual duty. We find no error in the formula applied by the trial court's instructions.

Accordingly, the decree is

*Affirmed.*

CARRICO, J., dissenting.

I dissent. I do not believe that the evidence was sufficient to present, as the majority holds, a jury question with respect to Appalachian's plea of impossibility of performance. The trial court, in my opinion, should have sustained that plea as a matter of law. I would, therefore, reverse and enter final judgment in favor of Appalachian.

HARRISON and COCHRAN, JJ., join in this dissent.